IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| SMITH & WESSON CORP., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> TOMKINS CORPORATION, ) <br> GEORGE PAPPAYLIOU, and ) <br> DANIEL J. DISSER ) <br> ) <br> Defendants. ) <br> ) | C.A. No. <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, Smith & Wesson Corporation ("Smith & Wesson"), by and through its undersigned counsel, alleges as follows:

### NATURE OF THE ACTION

1. This is an action against Tomkins Corporation ("Tomkins") for breach of contract, fraud, and unjust enrichment. The claims are based upon knowing and intentional misrepresentations and omissions of material fact by Tomkins and by senior Tomkins executives George Pappalyiou and Daniel Disser (the "Individual Defendants") regarding ownership of certain funds contributed by Smith & Wesson to an insurance-related escrow account maintained by AIG Risk Management.

2. Smith & Wesson seeks a declaratory judgment that it is entitled to the escrow funds, as well as costs, fees and expenses. Alternatively, Smith & Wesson seeks: (i) compensatory damages in the amount of $353,901, the monies contributed by Smith & Wesson to the escrow account; (ii) compensatory damages in an amount to be determined based upon the

negative impact defendant's fraudulent conduct will have on Smith & Wesson's earnings; and (iii) costs, fees and expenses.

## THE PARTIES

3.  Smith & Wesson is a wholly owned subsidiary of Smith & Wesson Holding Corporation, a Nevada Corporation. Smith & Wesson maintains its principal place of business at 2100 Roosevelt Avenue, Springfield, Massachusetts 01104.

4.  Tomkins is a Delaware Corporation which maintains its principal place of business at 1551 Wewatta Street, Denver, Colorado 80202.

5.  Defendant George Pappayliou ("Pappayliou"), is General Counsel and Secretary at Tomkins.

6.  Defendant Daniel J. Disser ("Disser"), is Chief Financial Officer at Tomkins PLC, the parent corporation of Tomkins.

## JURISDICTION & VENUE

7.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based upon the diversity of citizenship of the parties. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000). The Court also has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

8.  Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(c).

## BACKGROUND INFORMATION

A.  <u>The Acquisition Agreement</u>

9.  In 1986, Tomkins purchased Smith & Wesson from Forstman Little & Co., and continued its corporate ownership of Smith & Wesson through May 11, 2001.

10. Pursuant to a Stock Purchase Agreement ("Acquisition Agreement") dated May 11, 2001 ("May 11, 2001 Closing Date") between Tomkins and Saf-T-Hammer Corporation ("Saf-T-Hammer"), Saf-T-Hammer acquired all of the issued and outstanding shares of Smith & Wesson Corp (the "Acquisition"). Saf-T-Hammer subsequently changed its name to Smith & Wesson Holding Corporation.

11. The Acquisition Agreement was executed on behalf of Tomkins by its then (and current) General Counsel and Secretary, Defendant George Pappayliou.

12. As a result of the Acquisition, Smith & Wesson became a wholly owned subsidiary of Saf-T-Hammer.

13. Pursuant to the terms of the Acquisition Agreement, Tomkins sold, conveyed, assigned, transferred and delivered to Saf-T- Hammer all of the outstanding shares of Smith & Wesson.

14. In the Acquisition Agreement, Tomkins expressly represented and warranted to Saf-T-Hammer that Tomkins had good and marketable title to the assets of Smith & Wesson.

15. Thus, by way of the Acquisition Agreement, Tomkins expressly promised to deliver to Saf-T-Hammer all of the assets of Smith & Wesson, with the exception of those assets expressly excluded by the terms of the Acquisition Agreement and which were to be retained by Tomkins.

16. The Acquisition Agreement did not identify the monies contributed by Smith & Wesson to the escrow accounts as assets of Smith & Wesson that would be retained by Tomkins after its sale of Smith & Wesson.

17. Pursuant to the Acquisition Agreement each of the parties consented:

to submit to the exclusive jurisdiction of any court of the United States located in the State of Delaware for any litigation arising out of or relating to this Agreement and the transactions contemplated herby.

18. Moreover, the Acquisition Agreement provides that it "be governed by, enforced under and construed in accordance with the laws of the State of Delaware".

B. <u>The Escrow Accounts</u>

19. The escrow deposits made by Smith & Wesson at issue in this action are part of a total escrow account held by AIG Risk Management ("AIG") in the name of Tomkins.

20. A total of three hundred and fifty three thousand, nine hundred and one dollars ($353,901) was paid by Smith & Wesson out of Smith & Wesson funds to Tomkins to be provided to AIG as part of the Tomkins escrow accounts.

21. The deposits to the escrow accounts by Smith & Wesson, and currently held by AIG, relate to two accounts: (i) a products liability escrow account and (ii) a workers compensation escrow account (the "Escrow Accounts"). The product liability escrow account contains $100,000 that was funded entirely by Smith & Wesson. The workers compensation escrow account contains $253,901, that also was funded entirely by Smith & Wesson. Thus, of the entire amount of the Escrow Accounts held by AIG, $353,901, was paid by Smith & Wesson to Tomkins to be placed into the Escrow Accounts.

22. From the time Smith & Wesson funded the Escrow Accounts, up to and through the present, Smith & Wesson has at all times treated its escrow contributions as assets of Smith & Wesson. Defendants were fully aware of this and, until the summer of 2007, never objected to the way Smith & Wesson treated its escrow contributions.

23. In addition, from the time Smith & Wesson initially funded the Escrow Accounts, until the summer of 2007, Tomkins along with the Individual Defendants hid from Smith &

4

Wesson: (i) Tomkins' intention to keep the escrow amounts from Smith & Wesson once the Escrow Accounts are closed; and (ii) Tomkins' position that the funds in the Escrow Accounts contributed by Smith & Wesson did not belong to Smith & Wesson.

C.  <u>Pre-May 11, 2001 Closing Date Confirmation by Tomkins</u>

24. The Acquisition Agreement did not exclude the Escrow Accounts from the Smith & Wesson balance sheets at the time of the May 11, 2001 Closing Date.

25. The Escrow Accounts were treated as assets of Smith & Wesson at all times since their creation, through and including the May 11, 2001 Closing Date.

26. Beginning at least as early as March, 1999, Smith & Wesson regularly prepared comprehensive product liability status reports that were presented to, reviewed, and confirmed by senior management at Tomkins. Senior Tomkins management who participated in such reviews and were aware that the Escrow Accounts were being treated as assets of Smith & Wesson included, but was not limited to, the Individual Defendants.

27. Beginning at least as early as October, 1995, Smith & Wesson regularly prepared workers compensation analysis reports that were presented to, reviewed, and confirmed by senior management at Tomkins. Senior Tomkins management who participated in such reviews and were aware that the Escrow Accounts were being treated as assets of Smith & Wesson included, but was not limited to, the Individual Defendants.

28. These status reports were part of mid-year and year-end balance sheet reviews prepared by Smith & Wesson as required by its then corporate parent Tomkins.

29. Each of the mid-year and year-end balance sheet reviews expressly identified the Smith & Wesson escrow contributions as assets of Smith & Wesson Corp. Tomkins, and its senior management were at all times aware of this, and never contested the fact that the escrow

contributions made by Smith & Wesson were included on the Smith & Wesson financial balance sheets.

(i) <u>Product Liability Status Reports</u>

30.     The report entitled "Smith & Wesson Product Liability Status As of March 1999" (the "March 1999 Status Report") was provided to Tomkins and reviewed by senior management at Tomkins, including, but not limited to, one or both of the Individual Defendants.

31.     The March 1999 Status Report expressly identifies in Smith & Wesson financial statements a product liability "Escrow Credit" in the amount of one hundred thousand dollars ($100,000).

32.     Smith & Wesson continued to provide its balance sheet review materials to Tomkins on a regular basis. For example:

- The report entitled "Smith & Wesson Product Liability Status As of October 1999" (the "October 1999 Status Report") was provided to Tomkins and reviewed by senior management at Tomkins, including, but not limited to, one or both of the Individual Defendants. The October 1999 Status Report expressly identifies a product liability "Escrow Credit" in the amount of one hundred thousand dollars ($100,000).

- The report entitled "Smith & Wesson Product Liability Status As of March 2000" (the "March 2000 Status Report") was provided to Tomkins and reviewed by senior management at Tomkins, including, but not limited to, one or both of the Individual Defendants. The March, 2000 Status Report expressly identifies a product liability "Escrow Credit" in the amount of one hundred thousand dollars ($100,000).

- The report entitled "Smith & Wesson Product Liability Status As of October 2000" (the "October 2000 Status Report") was provided to Tomkins and reviewed by senior

management at Tomkins, including, but not limited to, one or both of the Individual Defendants. The October, 2000 Status Report expressly identifies a product liability "Escrow Credit" in the amount of one hundred thousand dollars ($100,000).

(ii) <u>Workers Compensation Reports</u>

33.  As part of the mid-year and year-end balance sheet reviews conducted by Smith & Wesson for Tomkins, Smith & Wesson Workers Compensation Analysis Reports (the "Workers Compensation Analysis Reports") were prepared for Tomkins. Each of the Workers Compensation Analysis Reports were provided to Tomkins and reviewed in detail by senior management at Tomkins by senior management at Tomkins, including, but not limited to, one or both of the Individual Defendants.

34.  Beginning at least as early as October 1995, the Workers Compensation Analysis clearly identified an escrow credit on behalf of Smith & Wesson.

- The report entitled "Smith & Wesson Workers Compensation Analysis October 1995" the ("October 1995 Analysis") was provided to Tomkins and reviewed by senior management at Tomkins, including, but not limited to, one or both of the Individual Defendants. The October 1995 Analysis expressly identifies a workers compensation "Escrow Credit" for fiscal year 1993 in the amount of one hundred and seventy eight thousand dollars ($178,000).

- Additional Smith & Wesson Workers Compensation Analysis Reports were prepared in, or about, April 1996, October 1996, April 1997, October 1997, April 1998, and October 1998. Each of these reports expressly identifies a workers compensation "Escrow Credit" for fiscal year 1993 in the amount of one hundred and seventy eight thousand dollars ($178,000).

7

- Each and every one of these reports sets forth a workers compensation "Escrow Credit" in the amount of one hundred and seventy eight thousand dollars ($178,000), and were timely provided to Tomkins as part of the Smith & Wesson mid-year and year-end balance sheet reviews conducted by Tomkins. Tomkins senior management, including, but not limited to, one or both of the Individual Defendants, reviewed each of these reports.

35. The report entitled "Smith & Wesson Workers Compensation Analysis April 1999" (the "April 1999 Analysis") was provided to Tomkins and reviewed by senior management at Tomkins, including, but not limited to, one or both of the Individual Defendants. The April 1999 Analysis expressly identifies two (2) separate workers compensation "Escrow Credits". The April 1999 Analysis includes the workers compensation "Escrow Credit" for fiscal year 1993 in the amount of one hundred and seventy eight thousand dollars ($178,000). The April 1999 Analysis also includes a workers compensation "Escrow Credit" for the June 1994-April 1999 self-insured period in the amount of seventy five thousand, nine hundred and one dollars ($75,901).

- The report entitled "Smith & Wesson Workers Compensation Analysis April 2000" (the "April 2000 Analysis") was provided to Tomkins and reviewed by senior management at Tomkins, including but not limited to, one or both of the Individual Defendants. The April 2000 Analysis includes the workers compensation "Escrow Credit" for fiscal year 1993 in the amount of one hundred and seventy eight thousand dollars ($178,000.00). The April 2000 Analysis also includes a workers compensation "Escrow Credit" for the June 1994 – April 1999 self-insured period in the amount of seventy five thousand, nine hundred and one dollars ($75,901.00).

- The report entitled "Smith & Wesson Workers Compensation Analysis October 2000" (the "October 2000 Analysis") was provided to Tomkins and reviewed by senior management at Tomkins including, but not limited to, one or both of the Individual Defendants. The October 2000 Analysis includes the workers compensation "Escrow Credit" for fiscal year 1993 in the amount of one hundred and seventy eight thousand dollars ($178,000.00). The October 2000 Analysis also includes a workers compensation "Escrow Credit" for the June 1994 – April 1999 self-insured period in the amount of seventy five thousand, nine hundred and one dollars ($75,901.00).

- Beginning at least as early as the April 1999 Analysis shared with Tomkins, the workers compensation "Escrow Credit" identified by Smith & Wesson as its own asset totaled two hundred fifty three thousand, nine hundred and one dollars ($253,901.00).

D.  Post-Sale Confirmation by Tomkins

36. During the period from the May 11, 2001 sale of Smith & Wesson by Tomkins through the summer of 2007, Tomkins repeatedly and consistently confirmed to Smith & Wesson: (i) the existence of the Escrow Accounts; and (ii) the fact that Smith & Wesson contributed a total of $353, 901 to such Escrow Accounts.

37. At no time during this period did Tomkins or the Individual Defendants communicate to Smith & Wesson that Tomkins ultimately would seek to keep the Smith & Wesson escrow contributions once the Escrow Accounts are closed.

38. For example, fully two years after the May 11, 2001 Closing Date, Tomkins, in reply to a request by Smith & Wesson, confirmed the existence of the Escrow Account and the monies contributed by Smith & Wesson. In an e-mail dated June 16, 2003, Linda Cavanaugh,

9

Insurance Analyst, Tomkins Industries, Inc. wrote to Sandy Ross at Smith & Wesson, Tomkins stating:

> Tomkins Industries, Inc. confirmed [sic] with AIG on an annual basis the escrow balance by policy basis the escrow balance by policy year. These balances were last confirmed as of December 31, 2002 and have remained the same since 1998. The proportions by company as listed in the 1998 schedule are still accurate.

39. During the summer of 2005, Tomkins once again was made aware that Smith & Wesson's external auditors needed to confirm the existence of the Smith & Wesson contributions to the Escrow Accounts. Once again, Tomkins had no problem providing the confirmation sought by Smith & Wesson - - the same confirmation given two years earlier by Tomkins.

40. By an e-mail dated June 3, 2005 from Sandy Ross at Smith & Wesson to Angie Lutterman, the then Corporate Director of Accounting & Reporting at Tomkins Industries, Inc. (the "Ross E-Mail") Smith & Wesson again asked Tomkins for confirmation concerning the Escrow Accounts:

> My name is Sandy Ross. I head up the General Accounting area at Smith & Wesson. We were a sub of Tomkins until May 2001 when we were sold to another company at that time. Under the Tomkins years, there were escrow credits for workers comp and products liability related specifically to Smith & Wesson. I received confirmation of these balances nearly two years ago from Linda Cavanaugh at Tomkins through Chrissy Bath at AON. Our outside auditors are asking us to confirm these balances once again. I will do it every year now going forward. I touched base with Chrissy last week and she referred me to you. Can you help me out on the issue? I would really appreciate any assistance you can provide. Please advise as to assistance and timing.

41. In reply to the June 3, 2005 Ross Email, Angie Lutterman, the then Corporate Director of Accounting & Reporting at Tomkins stated in part that "I did not have the escrow balances, so I asked our controller (Theresa Simmons) is [sic] she had anything on her files."

10

42. Later in the day on June 3, 2005 Teresa Simmons, the then Controller at Tomkins replied to the June 3, 2005 Ross E-mail by stating, in pertinent part, that "I am showing the escrow balance with AIG as $353, 901. Is this the amount you have?"

E.  The 2007 About Face By Tomkins

43. As it had done in previous years as part of its year end audit confirmations, in June, 2007, Smith & Wesson contacted Tomkins for yet another follow-up confirmation concerning the Escrow Accounts. By e-mail dated June 8, 2007, Joan M. Hartung, the then Director of Accounting at Smith & Wesson asked Teresa Simmons at Tomkins to confirm the Escrow Accounts (the "June 8, 2007 Hartung E-Mail"). The June 8, 2007 Hartung E-Mail, in relevant part, states:

> Theresa,
> Please let me introduce myself. About a year and a half ago I took over Sandy Ross's position as Director of Accounting when she moved on to lead our (Smith & Wesson) Internal Audit Department. Sandy has sent me your contact information so that I can work with you on two requested audit confirmations related to our Escrow Accounts for Workers Compensation and Product Liability. If you would send me your fax number, I will send out the confirmation letters on Monday morning. Your quick response in returning them would be greatly appreciated.

44. Ms. Simmons replied to the June 8, 2007 Hartung E-Mail as follows:

> Joan,
> Just for clarification, AIG holds the escrow balance for S&W. You should confirm the balance with AIG. Please contact Bill Fahrner [at AIG].

45. As part of its continuing efforts during June, 2007 to again confirm the escrow balance held on behalf of Smith & Wesson, Ms. Sandy Ross at Smith & Wesson sent the following e-mail, in relevant part, to Teresa Simmons at Tomkins:

> Our current external auditors from BDO Seidman would like us to get confirmation of the same escrow balances that we had confirmed two years ago for PWC [Price Waterhouse Cooper, Smith & Wesson's former external auditors]. The total amount is still $353.901. Product Liability

11

escrow is $100,000, and the remaining $253,901 relates to workers' compensation escrow. To that end, nothing has changed from two years ago when we confirmed that information via e-mail at that time.

*****

Can we agree at this point via e-mail (I think that would be sufficient evidence for our auditors) that the escrow balances do exist in the dollar amounts that I mentioned above, and that they indeed belong to Smith & Wesson in the end? Any help would be appreciated. Please advise.

46. On, or about July 10, 2007, Tomkins for the first time communicated to Smith & Wesson that it was Tomkins' position that the monies in the Escrow Accounts contributed by Smith & Wesson belonged to Tomkins, and not to Smith & Wesson.

47. Tomkins' 2007 reversal in its position was memorialized in the following e-mail from its CFO, Defendant Dan Disser, to John Kelly, CFO at Smith & Wesson:

> John,
> I have discussed this with George [Pappayliou] and the insurance people and their counsel is that Smith & Wesson does not now, nor never did have any right, title or claim to any escrow deposit inter-company allocations made to Smith & Wesson solely for internal management reporting reasons while Smith & Wesson was owned by Tomkins.

48. At the suggestion of Tomkins, during the summer of 2007, Smith & Wesson also sought confirmation of its escrow deposits directly from AIG Risk Management. By letter dated, and faxed to AIG Risk Management on June 11, 2007, Joan Hartung at Smith & Wesson wrote:

> Our auditors, BDO Seidman, LLP, are engaged in an audit of our financial statements. In connection therewith, please confirm directly to BDO Seidman, LLP whether or not the escrow deposit held by you as of April 29, 2007, as shown below, agree with your records. If this information does not agree with your records, please furnish any information you may have that will assist our auditors and us in reconciling the difference.
>
> | Account/Description | Balance |
> |---|---|
> | Escrow-Product Liability | $100,000.00 |
> | Escrow-Workers Compensation | $253,901.00 |

49. By letter dated June 11, 2007 from Bill Fahrner, Regional Manager, AIG Risk Management – National Accounts, to Nicole Tarquino at DBO Seidman, LLP (Smith & Wesson's outside auditors), AIG confirmed that Smith & Wesson had paid $353,901 to the Escrow Accounts. For the first time, however, AIG informed Smith & Wesson that its escrow contributions would not be returned to Smith & Wesson.

50. The June 11, 2007 AIG Letter states:

> AIG is not currently holding an escrow deposit from Smith & Wesson. However, we are holding an escrow deposit from our insured, Tomkins Corporation. It is my understanding based on a conversation with Teresa Simmons at Tomkins that out of the total Escrow amount we are holding for Tomkins, $353,901 was paid by Smith & Wesson to Tomkins to be provided to AIG as part of Tomkins' escrow deposit.
>
> The connection of Smith & Wesson to this particular part of the Tomkins escrow deposit is based on arrangements made between Tomkins and Smith & Wesson, to which AIG is not a party. So when we reach a point where AIG no longer requires this escrow deposit, the money will be returned to Tomkins.

## COUNT I
## BREACH OF CONTRACT

51. Smith & Wesson incorporates the allegations of paragraph 1 through 50 as if the same were fully set forth herein.

52. Except as expressly provided for in the Acquisition Agreement, Tomkins had a duty under the Acquisition Agreement to transfer to Smith & Wesson good and marketable title to all assets of Smith & Wesson including the Escrow Account funds at issue herein.

53. Tomkins breached its duty of good faith and fair dealing by informing Smith & Wesson in the summer of 2007 that it intended to keep the monies contributed by Smith & Wesson to the escrow funds once the Escrow Accounts are closed.

54. Tomkins' recently stated intent to keep the escrow account funds from being distributed to Smith & Wesson would adversely impact the financial balance sheets of Smith & Wesson, thereby significantly reducing Smith & Wesson's earnings per share.

## COUNT II
## FRAUD

55. Smith & Wesson incorporates the allegations of paragraphs 1 through 54 as if the same were fully set forth herein.

56. Defendants knowingly, and with the intent to defraud, made or cause to be made misrepresentations and omissions of material fact by: (i) failing to inform Smith & Wesson prior to the May 11, 2001 Closing Date that Tomkins ultimately would claim ownership of the amounts contributed by Smith & Wesson to the Escrow Accounts; and (ii) continuing, for a period of more than six (6) years after the May 11, 2001 Closing Date, to acknowledge and to confirm to Smith & Wesson that the escrow amounts rightfully belonged to Smith & Wesson.

57. Tomkins knew that the representations prior to 2007 were false and misleading at the times they were made because they failed to disclose Tomkins' ultimate plan to block the escrow amounts from being returned to Smith & Wesson.

58. Defendants, or others acting on their behalf, made those misrepresentations and/or omissions, or caused them to be made, with knowledge of their falsity or recklessly without regard for their truthfulness, with the intent to deceive Smith & Wesson.

59. In addition, Defendants made those misrepresentations and/or omissions, or caused them to be made, with knowledge of their falsity or recklessly without regard for their truthfulness, with the intent to deceive Smith & Wesson, and with the intent to induce Smith & Wesson to: (i) agree to certain terms and conditions in the Acquisition Agreement more favorable to Tomkins than they would have been had Tomkins' true intent concerning the escrow

accounts been disclosed to Smith & Wesson prior to the execution of the Acquisition Agreement; (ii) include its escrow contributions as an asset of Smith & Wesson both prior to, and at the time of the May 11, 2001 Closing Date; and (iii) continue, from the May 11, 2001 Closing Date through the present, to identify and to include the Smith & Wesson escrow contributions as its own asset in public filings and reports.

60. Tomkins' refusal to acknowledge and to confirm Smith & Wesson's right to the escrow amounts upon settlement of the escrow accounts, and its recently stated intent to keep the escrow amounts from being distributed to Smith & Wesson would significantly injure Smith & Wesson and its shareholders by reducing earnings per share.

## COUNT III
## UNJUST ENRICHMENT

61. Smith & Wesson incorporates the allegations of paragraphs 1 through 60 as if the same were fully set forth herein.

62. Smith & Wesson pleads its claim of unjust enrichment in the alternative to its breach of contract claim.

63. By now refusing to acknowledge Smith & Wesson's right to the escrow amounts upon settlement of the escrow accounts, and by its stated intention to keep the escrow amounts, Tomkins has been and will be unjustly enriched and Smith & Wesson has been impoverished.

64. There is a direct relation between Tomkins' unjust enrichment and Smith & Wesson's impoverishment.

65. No justification exists for Tomkins' wrongful taking of the monies contributed by Smith & Wesson to the Escrow Accounts.

## PRAYER FOR RELIEF

WHEREFORE, Smith & Wesson prays for judgment and relief as follows:

(a) Declaring that all of the monies contributed by Smith & Wesson to the Escrow Accounts belong to Smith & Wesson;

(b) Declaring that Tomkins breached the Acquisition Agreement through its efforts to assert ownership of the monies contributed by Smith & Wesson to the Escrow Accounts;

(c) Declaring that Tomkins was unjustly enriched by its fraudulent conduct;

(d) Awarding Smith & Wesson damages in the amount of three hundred and fifty three thousand, nine hundred and one dollars ($353,901), together with judgment interest at the maximum rate allowable by law;

(e) Awarding Smith & Wesson damages in the amount of the loss it will suffer in the event the Escrow Accounts are settled and the funds are not returned to Smith & Wesson;

(f) Awarding Smith & Wesson its attorney fees and costs; and

(g) Granting Smith & Wesson such further relief as the Court may deem just and equitable.

Dated: June 3, 2008                                    CONNOLLY BOVE LODGE & HUTZ LLP

                                                       /s/ Kevin F. Brady
                                                       Kevin F. Brady (Bar No. 2248)
                                                       Jeremy D. Anderson (Bar No. 4515)
                                                       1007 North Orange Street
                                                       P.O. Box 2207
                                                       Wilmington, DE 19899
                                                       Telephone: (302) 658-9141
                                                       Facsimile: (302) 658-5614
                                                       kbrady@cblh.com
                                                       janderson@cblh.com

                                                       *Attorneys for Plaintiff Smith & Wesson Corp.*

OF COUNSEL:

Law Offices of
William J. Wright, Jr.
William J. Wright, Jr., Esquire
1118 E. Seventh Street
Plainfield, New Jersey 07062
(908) 337-7084

614685_1

Case 1:08-cv-00331-GMS    Document 1    Filed 06/03/2008    Page 17 of 17

JS 44 (Rev. 12/96)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS
Smith & Wesson Corp.

## DEFENDANTS
Tomkins Corporation, George Pappayliou and Daniel J. Disser

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF:** Hampden County, MA

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT:** Denver County, CO

**(c) ATTORNEYS (FIRM NAME, ADDRESS AND TELEPHONE NUMBER)**
Kevin F. Brady (#2248)
Connolly Bove Lodge & Hutz LLP
P.O. Box 2207, 1007 North Orange Street
Wilmington, Delaware 19899-2207
(302) 658-9141

**ATTORNEYS (IF KNOWN)**

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

|   | PTF | DEF |   | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug |  | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws |  | ☐ 450 Commerce/CC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | ☐ 640 R.R. & Truck |  | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. |  | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 820 Copyrights | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | **PERSONAL INJURY** ☐ 362 Personal Injury - Med. Malpractice | ☐ 690 Other | ☐ 830 Patent | ☐ 850 Securities/ Commodities Exchange |
|  | ☐ 365 Personal Injury - Product Liability |  | ☐ 840 Trademark | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders Suits | ☐ 368 Asbestos Personal Injury Product Liability |  |  | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | **PERSONAL PROPERTY** |  |  | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 370 Other Fraud |  |  | ☐ 893 Environmental Matters |
|  | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 894 Energy Allocation Act |
|  | ☐ 350 Motor Vehicle |  | ☐ 862 Black Lung (923) | ☐ 895 Freedom of Information Act |
|  | ☐ 355 Motor Vehicle Product Liability | ☐ 720 Labor Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) |  |
|  | ☐ 360 Other Personal Injury | ☐ 730 Labor Mgmt Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
|  | ☐ 380 Other Personal Property Damage |  | ☐ 865 RSI (405(g)) |  |
|  | ☐ 385 Property Damage Product Liability |  |  | ☐ 950 Constitutionality of State Statutes |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 740 Labor Railway Act |  | ☐ 890 Other Statutory Actions |
| ☐ 220 Foreclosure | ☐ 442 Employment |  |  |  |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |  |
| ☐ 240 Torts to Land | ☐ 444 Welfare | **HABEAS CORPUS:** |  |  |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | ☐ 871 IRS - Third Party 26 USC 7609 |  |
| ☐ 290 All Other Real Property |  | ☐ 530 General |  |  |
|  |  | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act |  |
|  |  | ☐ 540 Mandamus & Other |  |  |
|  |  | ☐ 550 Civil Rights |  |  |
|  |  | ☐ 555 Prison Condition |  |  |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
28 U.S.C. § 1332(a) and § 2201(a) Breach of contract, fraud and unjust enrichment regarding ownership of certain funds contributed by plaintiff to insurance related escrow account

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23
**DEMAND:** Amount to be determined
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY: (See instructions):

**DATE** June 3, 2008   **SIGNATURE OF ATTORNEY OF RECORD:** *[signature: Kevin F. Brady]*

**FOR OFFICE USE ONLY**
RECEIPT #   AMOUNT   APPLYING IFP   JUDGE   MAG. JUDGE